## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ADSTEC CORPORATION and ADS BIOTEC, INC., individually and as successor in interest of TRANSGENOMIC, INC. | CASE NO. 24-399 |
| Plaintiffs, | |
| v. | COMPLAINT AND DEMAND FOR JURY TRIAL |
| IDEX PI, LLC, IDEX-O, LLC, JIM ZHU, NICK NECKELMANN, MOHSEN ORODPOUR, and KAMRAN ORODPOUR | |
| Defendants. | |

### PARTIES AND BACKGROUND FACTS

1.      Plaintiff, ADSTEC CORPORATION ("ADSTEC") is a Japanese corporation with its principle place of business in Japan.

2.      Since 2002 ADSTEC has been a technology company.

3.      Since 2003 a division of ADSTEC has developed, designed, manufactured, marketed, and sold laboratory automation instruments, which it sells under the brand name HANABI.

4.      HANABI instruments are sold worldwide to hospitals, clinical labs, and universities for cytogenetic applications.

5.      TRANSGENOMIC, INC. ('TRANSGENOMIC") was incorporated under the laws of Delaware in 1997.

6.      Around 2005, TRANSGENOMIC and ADSTEC entered into a distribution agreement for purposes of distributing the HANABI products.

6512292.3

7.     Around 2005 Defendant, Jim Zhu ("Zhu") was employed by TRANSGENOMIC as a Vice President of Sales, was based in China, and was responsible for distribution of the HANABI products in the Asian market.

8.     While employed by TRANSGENOMIC Zhu formed, managed, and operated Defendant, SPECTRON SCIENTIFIC CO. LTD. ("SPECTRON").

9.     SPECTRON was formed under the laws of China without TRANSGENOMIC's knowledge or consent.

10.    SPECTRON markets, sells, and services instruments for cytogenetic applications.

11.    On December 1, 2010, SPECTRON entered into a **Distributor Agreement** with TRANSGENOMIC, a true and accurate copy of which is attached hereto as EXHIBIT 1.

12.    At the time the **Distributor Agreement** was signed, Zhu signed the Distributor Agreement on behalf of TRANSGENOMIC and concealed his involvement in the formation, oversight, and management of SPECTRON from ADSTEC.

13.    Plaintiff, ADS BIOTEC, INC. ("BIOTEC") is organized under the laws of Delaware and has its principal place of business in Nebraska.

14.    BIOTEC is a wholly owned subsidiary of ADSTEC that was formed around 2015.

15.    Through an Asset Purchase Agreement, BIOTEC acquired all assets owned by TRANSGENOMIC, including TRANSGENOMIC'S rights under the **Distributor Agreement** with SPECTRON.

16.    Since 2015, ADSTEC and BIOTEC (collectively "ADS") have continuously engaged in the business of developing, designing, manufacturing, marketing, selling, distributing, and servicing metaphase harvesters, auto spreaders, and consumable products used by these

6512292.3

instruments, which are automated systems used in cytogenetic, pathology and research/diagnostic labs.

17.     On June 1, 2016, BIOTEC and Zhu entered into an **Employment Agreement**, a true and accurate copy of which is attached hereto as EXHIBIT 2.

18.     Defendant, IDEX PI, LLC ("IDEX PI") is a company organized under the laws of Colorado with its principle place of business in Colorado.

19.     Defendant, Zhu:

    A.     Organized IDEX PI.

    B.     Is currently a citizen and resident of the state of Colorado.

    C.     Is an employee, agent, manager, officer, and/or representative of IDEX PI.

    D.     Zhu executed two agreements, the Distribution Agreement and Employment Agreement wherein he agreed to conduct his activities in compliance with the laws of Nebraska.

    E.     Zhu entered into a contract(s) with ADS and/or TRANSGENOMIC, agreeing to sell and promote the HANABI products throughout the United States, including Nebraska.

    F.     And, in his decades long career in sales of laboratory instruments, Zhu has frequently called upon clients in Nebraska and marketed directly to consumers in the State of Nebraska.

    G.     More recently, as a representative of IDEX PI, Zhu has communicated with Nebraska hospitals, clinical labs, and universities attempting to sell them laboratory instruments.

20.     Defendant, Nick Neckelmann ("Neckelmann"):

    A.  Is a former employee of TRANSGENOMIC.

B.  Is a citizen and resident of the state of California.

C.  Is a member or manager of IDEX PI.

D.  Is an employee, agent, and/or representative of IDEX PI.

E.  Is the Director of Sales for IDEX PI.

F.  Neckelmann entered into a contract(s) with ADS and/or TRANSGENOMIC, agreeing to sell and promote the HANABI products throughout the United States, including Nebraska.

G.  In his decades long career in sales of laboratory instruments, Neckelmann has frequently called upon clients in Nebraska and marketed directly to consumers in the State of Nebraska.

H.  More recently, as a representative of IDEX PI, Neckelmann has communicated with Nebraska hospitals, clinical labs, and universities attempting to sell them laboratory instruments.

21.     Defendant IDEX-O LLC ("IDEX-O") is a company organized under the laws of California with its principle place of business in California.

22.     Defendant, Mohsen Orodpour ("M. Orodpour"):

A.      Is a former employee of TRANSGENOMIC.

B.  Is a citizen and resident of the state of California.

C.  Is a member or manager of IDEX-O.

D.  Is an employee, agent, and/or representative of IDEX-O.

E.  M. Orodpour entered into a contract(s) with ADS and/or TRANSGENOMIC, agreeing to sell and promote the HANABI products throughout the United States, including Nebraska.

4

F. In his decades long career in sales of laboratory instruments, M. Orodpour has frequently called upon clients in Nebraska and marketed directly to consumers in the State of Nebraska.

G.      More recently, as a representative of IDEX-O, M. Orodpour has communicated with Nebraska hospitals, clinical labs, and universities attempting to sell them laboratory instruments.

23.     Defendant, Kamran Orodpour ("K. Orodpour"):

A.      Organized and founded IDEX-O.

B.      Is a citizen and resident of the state of California.

C.      Is a member or manager of IDEX-O.

D.      Is an employee, agent, and/or representative of IDEX-O.

E.  Upon information and belief, as a representative of IDEX-O, K. Orodpour has communicated with (via electronic means and personal meetings taking place in the state of Nebraska) multiple Nebraska hospitals, clinical labs, and universities attempting to sell them laboratory instruments.

24.     MEINAITE EQUIPMENT LTD ("MEINAITE") is an entity organized under the laws of China with its principle place of business in China.

25.     Upon information and belief, Zhu, Neckelmann, M. Orodpour, K. Orodpour, IDEX PI, IDEX-O, SPECTRON, and MEINAITE have entered an agreement to engage in a joint enterprise intended to carryout the illegal purpose of misappropriating the intellectual property rights owned by ADS, breaching the agreements signed by Zhu, and violating other fair competition laws as set forth more fully below.

6512292.3

26.     IDEX PI, and IDEX-O are the mere alter egos of Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour such that their corporate veils should be pierced and they should be held individually and/or jointly liable for the damages they've caused to ADS.

27.     The amount in controversy exceeds $75,000.00.

## JURISDICTION AND VENUE

28.     This Court has general personal over each of the Defendants because they've purposefully availed themselves of the laws of this state by repeatedly travelling to and conducting business in the state of Nebraska with Nebraska businesses, consumers, and potential consumers.

29.     This Court has specific personal jurisdiction over each of the Defendants because their conduct in misappropriating ADS's trademarks, trade dress, trade secrets are uniquely and expressly aimed at Nebraska, multiple contracts they've breached are governed by Nebraska law, and they've intentionally directed their harmful conduct at BIOTEC, whose principle place of business is in Nebraska.

30.     This Court has diversity jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and because the amount in controversy exceeds $75,000.00.

31.     This Court also has federal question jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1331, because Defendants have, individually and/or collectively, violated the Lanham Act.

32.     Venue in this Court is proper because the **Distributor Agreement** and **Employment Agreement** described in this Complaint specify that if either party elects to pursue legal action against the other for any obligation under the contract such action shall be brought in the State of Nebraska.

6512292.3

## CAUSES OF ACTION

### COUNT I: TRADEMARK INFRINGEMENT
**(Lanham Act, 15 U.S.C. § 1115, et. seq.; Nebraska Trademark Act, Neb. Rev. Stat. § 87-140, and Nebraska Common Law)**
**(IDEX PI, IDEX-O, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)**

33.    ADS incorporates herein all allegations set forth in the proceeding paragraphs.

34.    Since at least 2002, ADS has used the following marks in conjunction with the branding, marketing, and sale of their HANABI line of laboratory instruments and consumable products:



35.    The afore depicted trademarks (hereinafter the "Trademarks") are used on metaphase harvesters, auto spreaders, and/or consumable products associated therewith and sold by ADS.

36.    The Trademarks are also used on ADSTEC and BIOTEC's website, brochures, pamphlets, displays, signage, manuals, literature, and in other marketing materials for the laboratory instruments and related consumable products they sell.

37.    Geographically, these Trademarks have been used on products sold by ADS in every state in the United States, as well as every country throughout the world for at least a decade.

7

6512292.3

38.     ADS has spent and continues to spend considerable resources establishing these Trademarks in the minds of consumers in these markets in which they sell their products.

39.     As a result, these Trademarks have become known to and recognized by the consuming public as designating and identifying ADS's products.

40.     These Trademarks have achieved secondary meaning within the minds of consumers.

41.     These Trademarks meet the definition of "famous" under Neb. Rev. Stat. § 87-140 due to their distinctive qualities and the fame the marks have achieved.

42.     These Trademarks meet the definition of a "famous" mark under the Lanham Act, 15 U.S.C. § 1125(c), due to their wide recognition by the consuming public.

43.     Accordingly, ADS are the owners of broad state, common law, and federal trademark rights for these Trademarks.

44.     Defendants, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour organized and continue to operate IDEX PI and IDEX-O for the purpose of conducting activities designed to infringe upon the Trademarks, as well as trade on the goodwill of ADS in the minds of consumers.

45.     Specifically, all aforementioned Defendants have commenced using the following marks in conjunction with the sale of metaphase harvesters, auto spreaders, and consumable products associated therewith:

 



46.     Hereinafter the marks depicted in the preceding paragraph and any similar marks used by Defendants are referred to as the "Infringing Marks".

47.     Despite the limitless number of other options available, the Infringing Marks use the same words ("Harvester" and "Spreader"), fonts, colors, color scheme, and color arrangements as the Trademarks.

48.     The Infringing Marks are used by IDEX PI and IDEX-O on the following websites:

www.idex-o.com

www.idexpi.com

49.     IDEX PI, IDEX-O, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour have also used the Infringing Marks in brochures, pamphlets, displays, signage at tradeshows, personal sales calls, manuals, literature, and in other marketing materials.

50.     All of these Defendants' uses of the Infringing Marks is in conjunction with the sale of metaphase harvesters, auto spreaders and consumable products associated therewith, that are nearly identical to those being sold by ADS with the Trademarks.

51.     These Defendants' use of the Infringing Marks is likely to deceive, cause confusion, and cause mistakes among consumers as to the source of products being offered for sale by these Defendants.

52.     These Defendants' use of the confusingly similar Infringing Marks constitutes an appropriation of ADS'S reputation, goodwill, business opportunities, and revenues.

53.     ADS has no control over the products or services offered by these Defendants.

6512292.3

54.     ADS has demanded, in writing, that these Defendants cease and desist the use of the Infringing Marks. But, they continue to use the Infringing Marks in the same manner as set forth above.

55.     These Defendants intentionally, willfully, and deliberately chose to use the Infringing Marks that they know or should know are reasonably likely to deceive and/or cause consumer confusion as to the designer and manufacture of the metaphase harvester, auto spreaders, and consumable products they are selling.

56.     The intentional, willful, and deliberate intent can be inferred from these Defendants' extensive relationship with ADS.

57.     These Defendants' actions constitute unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125, as well as Nebraska's common law and statutory trademark laws.

58.     These Defendants' unlawful acts have proximately caused irreparable injury to ADS including: dilution by blurring of the Trademarks and dilution by tarnishment of the Trademarks, as well as damages in the form of lost profits and revenues.

59.     Unless restrained by this Court, these Defendants unlawful acts will continue to cause irreparable injury to ADS.

60.     The public will also continue to suffer irreputable injury

61.     There is no adequate remedy at law for the infringement, dilution, and tarnishment of the Trademarks caused by these Defendants' use of infringing marks.

62.     Pursuant to 15 U.S.C.A. §§ 1116 and 1117 and/or Neb. Rev. Stat. § 87-141, ADS prays for the following relief:

        A.     Defendants be enjoined from any further manufacture, display, and/or sale of metaphase harvesters, auto spreaders, and related consumable products.

6512292.3

B.    Defendants be ordered to deliver to the Court counterfeit and imitation metaphase harvesters, auto spreaders, and related consumable products in the possession and control of these Defendants with the same being promptly destroyed upon delivery.

C.    Entering judgment in favor of ADS and against Defendants in the amount of all profits these Defendants have received from the sale of these products and/or awarding other damages (including a reasonable royalty fee) due to Defendants' misappropriation, dilution, and tarnishment of the Trademarks.

D.    Ordering Defendants to pay ADS's attorney's fees and costs in bringing this litigation.

E.    Ordering Defendants to pay interest on the judgment awarded as allowed by any applicable statute.

F.    Granting ADS any other relief the Court deems just and appropriate.

**COUNT II: TRADE DRESS INFRINGEMENT**
**(IDEX-O, IDEX PI, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)**

63.    ADS incorporates herein each and every allegation in the preceding paragraphs.

64.    Since at least 2015 ADS has used specific trade dress, as depicted to the right (hereinafter the "Trade Dress"), in conjunction with the branding, marketing, and sale of their HANABI PIII Metaphase Harvester.



65.    ADS has spent and continues to spend resources using this Trade Dress to sell the HANABI PIII Metaphase Harvester in every state in the United States as well as every country throughout the world for at least a decade.

11

66.     The tan product color, tilted window, display located to the right, the buttons surrounding the controls, the shelf on the left, and overall layout of these features serve more than a functional purpose.

67.     Rather, the primary purpose of this Trade Dress is to serve a source identifying function for ADS's HANABI PIII, such that the Trade Dress has achieved secondary meaning within the minds of consumers.

68.     Accordingly, ADS are the owners of broad state, common law, and federal trade dress rights for this Trade Dress.

69.     Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour organized and continue to operate IDEX-O and LLC, IDEX PI, LLC for the purpose of violating the Trade Dress rights of ADS by using the dress depicted to the right (hereinafter "Infringing Dress") in conjunction with the sale of metaphase harvesters



70.     Despite the limitless number of other options available, the Infringing Dress uses substantially similar dress as the Trade Dress, including the tan color, tilted window, the display located to the right, the buttons surrounding the controls, the shelf on the left, and overall layout of these features.

71.     The use of the Infringing Dress by Defendants is likely the cause consumer confusion as to the source of the products being sold by Defendants; mainly consumers are likely to be confused as to whether the products being sold by Defendants are designed, manufactured, sold, sponsored, endorsed by or affiliated with ADS.

72.     Defendant's actions in using a substantially similar, Infringing Dress, constitute unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125 and Nebraska's common law.

12

73.     These Defendants unlawful acts have proximately caused irreparable injury to ADS.

74.     Unless restrained by this Court, these Defendants' unlawful acts will continue to cause irreparable injury to ADS.

75.     The public will also continue to suffer irreputable injury due to the confusion caused by the Infringing Dress.

76.     There is no adequate remedy at law for this Trade Dress infringement.

77.     Pursuant to 15 U.S.C.A. §§ 1116 and 1117 and Nebraska's common law, ADS prays for the following relief:

A.     Defendants be enjoined from any further manufacture, display, and/or sale products bearing the Infringing Dress.

B.     Defendants be ordered to deliver to the Court the products bearing the Infringing Dress in the possession and control of these Defendants with the same being promptly destroyed upon delivery.

C.     Entering judgment in favor of ADS and against Defendants in the amount of all profits these Defendants have received from the sale of the products bearing the Infringing Dress and/or awarding other damages (including a reasonable royalty fee) due to Defendants' misappropriation, dilution, and tarnishment of the Trade Dress.

D.     Ordering Defendants to pay ADS's attorney's fees and costs in bringing this litigation.

E.     Ordering Defendants to pay interest on the judgment awarded as allowed by applicable statutes.

F.     Granting ADS any other relief the Court deems just and appropriate.

## COUNT III: NEBRASKA'S DECEPTIVE TRADE PRACTICES ACT
### (Neb. Rev. Stat. § 87-301, *et. seq.*)
### (IDEX-O, IDEX PI, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)

78.    ADS incorporates herein each and every allegation in the preceding paragraphs.

79.    Defendants are engaged in a combination of activities to sell products substantially similar to the products being sold by ADS, including the following:

A.    Using a trademark consisting of similar fonts, words, colors, and color combinations as the Trademark,

B.    Using trade dress similar to the Trade Dress,

C.    Using displays, depictions, and process descriptions that are substantially similar to the displays, depictions, and process descriptions used on ADS's products.

80.    Each of these practices and/or any combination of such practices is being conducted by Defendants (either individually or jointly) and results in:

A.    Defendants passing off their goods (their metaphase harvesters, auto spreaders, and consumable products associated therewith) as those produced and sold by ADS.

B.    A likelihood of confusion or misunderstanding as to whether ADS is the source of the products Defendants are selling.

C.    A likelihood of confusion as to whether ADS sponsors, approves of, certifies, is affiliated with, connected to, or associated with the metaphase harvesters, auto spreaders, and consumable products associated therewith being sold by Defendants.

81.    Defendants have engaged in such deceptive practices willfully and with the intent to deceive.

82.    Pursuant to Neb. Rev. Stat. § 87-303 and Nebraska's common law, ADS prays for the following relief:

14

A.    Defendants be enjoined from any further manufacture, display, and/or sale of metaphase harvesters, auto spreaders, or consumable products associated therewith,

B.    Entering judgment in favor of ADS and against Defendants in the amount of all profits or other damages caused by Defendants' conduct in violation of Nebraska's Uniform Deceptive Trade Practices Act.

C.    Ordering Defendants to pay ADS's attorney's fees and costs in bringing this litigation.

D.    Ordering Defendants to pay interest on the judgment awarded as allowed by any applicable statute.

E.    Granting ADS any other relief the Court deems just and appropriate.

## COUNT IV: NEBRASKA'S CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1601, *et. seq.*)
### (IDEX-O, IDEX PI, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)

83.    ADS incorporates herein each and every allegation in the preceding paragraphs.

84.    Defendants are engaged in a combination of activities to sell products substantially similar to the products being sold by ADS, including the following:

A.    Using a trademark consisting of similar fonts, words, colors, and color combinations as the Trademark,

B.    Using trade dress similar to the Trade Dress,

C.    Using displays, depictions, and process descriptions that are substantially similar to the displays, depictions, and process descriptions used on ADS's products.

85.    Each of these practices and/or any combination of such practices is being conducted by Defendants (either individually or jointly) in commerce and in a manner that directly or indirectly affects people in the state of Nebraska.

6512292.3

86.     Each of the aforementioned practices:

A.     Results in Defendants passing off their goods (their metaphase harvesters, auto spreaders, and consumable products associated therewith) as those produced and sold by ADS.

B.     Causes a likelihood of confusion or misunderstanding as to whether ADS is the source of the products Defendants are selling.

C.     Causes a likelihood of confusion as to whether ADS sponsors, approves of, certifies, is affiliated with, connected to, or associated with the metaphase harvesters, auto spreaders, and consumable products associated therewith that Defendants are selling.

87. Defendants have engaged in such deceptive practices willfully and with the intent to deceive.

88. Pursuant to Neb. Rev. Stat. § 59-1609 and Nebraska's common law, ADS prays for the following relief:

A. Defendants be enjoined from any further manufacture, display, and/or sale of metaphase harvesters, auto spreaders, or consumable products associated therewith,

B. Defendants be ordered to deliver to the Court the products bearing the Infringing Dress in the possession and control of these Defendants with the same being promptly destroyed upon delivery to prevent further confusion,

C. Entering judgment in favor of ADS and against Defendants in the amount of all damages caused by Defendants conduct in violation of Nebraska's Consumer Protection Act, as well as an increase in the damages by up to $1,000 dollars.

D. Ordering Defendants to pay ADS's attorney's fees and costs in bringing this litigation.

E.   Ordering Defendants to pay interest on the judgment awarded as allowed.

F.   Granting ADS any other relief the Court deems just and appropriate.

## COUNT V: TRADE SECRET MISAPPROPRIATION
### (Nebraska's Trade Secret Act, Neb. Rev. Stat. § 87-501, *et. seq.,* and Nebraska's common law)
### (IDEX PI, IDEX-O, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)

89.    ADS incorporates herein each and every allegation in the preceding paragraphs.

90.    ADS has maintained:

A.    certain confidential compilations and lists of existing and potential customers, as well as key customer contacts.

B.    Software codes, data, and processes for producing the harvesters and spreaders that they sell.

C.    Processes and formulas used to create its consumable products.

D.    Lists of suppliers and product production costs.

E.    Product pricing formulas.

F.    Other confidential information regarding ADS's business.

91.    ADS obtains independent economic value from its customer lists, suppliers, pricing formulas, codes, processes, and product formulas not being known to other persons and not being ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

92.    ADS has taken reasonable steps and efforts to maintain the secrecy of the above noted confidential information, which is not generally known to the public or ascertainable by any other proper means.

93.    The steps taken to maintain the secrecy of the above noted information, include but are not limited to the use of protected storage systems for the information, restricted accesses, and

17

6512292.3

confidentiality provisions in its Employment Agreements, Distribution Agreements, and Independent Contractor Agreements.

94.     As a result, ADS's (A) compilations and lists of existing and potential customers, as well as key customer contacts (B) Software codes, data, and processes for producing the harvesters and spreaders that they sell, (C) processes and formulas used to create its consumable products, (D) Lists of suppliers and product production costs, (E) product pricing formulas, and (F) Other confidential information regarding ADS's business are entitled to protection as trade secrets under Nebraska

95.     Through their employment and independent contractor relationships with ADS (including BIOTEC's predecessor in interest TRANSGENOMIC) and after executing multiple agreements with confidentiality provisions, Zhu, Neckelmann and M. Orodpour obtained access to ADS's confidential, trade secret information, as identified in the preceding paragraph.

96.     Zhu, Neckelmann, and M. Orodpour have since created and/or engaged SPECTRON, MEINAITE, IDEX PI, IDEX-O, and K. Orodpour for the sole purpose of misappropriating the trade secret information they obtained from ADS by designing, manufacturing, marketing, selling, and distributing products that are nearly identical to those being sold by ADS.

97.     Through this joint venture(s) and enterprise(s), these Defendants have individually and/or jointly misappropriated ADS's trade secrets.

98.     To date, the information has not become public knowledge through any thing other than the wrongful acts of Zhu, Neckelmann, and M. Orodpour, as discussed otherwise herein.

99.     Pursuant to Neb. Rev. Stat. §§ 87-503 and 87-504 and Nebraska's common law, ADS prays for the following relief:

6512292.3

A. Defendants be enjoined from any further manufacture, display, and/or sale of metaphase harvesters, auto spreaders, or consumable products associated therewith,

B. Payment of damages based upon the actual loss caused by Defendant's misappropriation and the unjust enrichment they received as a result of the misappropriation, including a reasonable royalty fee for the unauthorized use of the confidential information.

C. Granting ADS any other relief the Court deems just and appropriate.

## COUNT VI: BREACH OF CONTRACT
### (Zhu and his alter ego, SPECTRON)

100. ADS incorporates herein each and every allegation in the preceding paragraphs.

101. ADS and Zhu entered into the following valid agreements:

A. A December 1, 2010 Distribution Agreement SPECTRON (Zhu's alter ego) and TRANSGENOMIC (a company acquired by BIOTEC in 2016) (attached hereto as EXHIBIT 1);

B. A June 1, 2016 Employment Agreement between Zhu and BIOTEC (attached hereto as EXHIBIT 2); and

102. Each of the above noted Agreements were valid and enforceable contracts as they were formed due to the exchange of an offer, acceptance, and payment of consideration.

103. Each of the above noted Agreements contains sufficiently clear, definite, and unambiguous terms that are valid and enforceable.

104. Paragraph 18.C. of the **Distribution Agreement** (EXHIBIT 1), for example, includes the following terms:

> Transgenomic and the Distributor [Spectron] agree that this Agreement does not grant the Distributor any right, title, or interest in and to Trangenomic's…trade secrets…processes, designs, formulas or any other such rights or information (the Proprietary Information"). The Distributor shall not use any of the Proprietary Information… in conjunction with Distributor's

conduct of its business operations except as specifically instructed or authorized
by Transgenomic in writing.

105.    The Distribution Agreement further included a Mutual Confidentiality Agreement

(See Exhibit A to the Distribution Agreement in EXHIBIT 1), through which Zhu, as an officer or

director of SPECTRON was bound to the terms of the Mutual Confidentiality Agreement.

106.    Said Mutual Confidentiality Agreement governed:

> the use of certain information, knowledge, processes, improvements,
> inventions, techniques, formulae, products, business information, materials,
> samples, software, data and/or know how related to distribution of
> Transgenomic products (hereinafter "Information"), which Information
> shall remain the property of the disclosing party, and which Transgenomic
> and Distributor [Spectron] will keep confidential. [It was further agreed by
> the parties:]
>
> 2. To not use disclosing party Information for commercial benefit or to
> adversely affect the business of the disclosing party.
>
> 3. To obligate employees and/or agents with access to disclosing party
> Information to protect the confidential and proprietary nature of the
> Information in accord with this Agreement.
>
> .        .        .
>
> 8. The obligations of confidentiality, non-disclosure and non-use will
> survive termination of this Agreement.
>
> 9. Upon completion of evaluation, request or termination of this Agreement
> the parties will promptly return or destroy all Information in their
> possession.

107.    Paragraph 6 of Zhu's Employment Agreement (EXHIBIT 2) is titled "Intellectual

Property and Confidential Information" and, as a second example of definite terms, included the

following terms:

> This offer of employment is conditional on you [Zhu] signing and agreeing
> to be bound by the terms of the "Confidentiality and Proprietary Information
> Agreement" and "Conflict of Interest Policy enclosed with this Agreement".

6512292.3

108.     Paragraph 8, of the Independent Contractor Agreement (Exhibit B) is titled "Confidential Information" and, as a third example of definite terms, states in pertinent part:

> Consultant [Zhu] recognizes and acknowledges that it will have access to confidential information of the Company (ADSTEC), including without limitation, customer information, lists of suppliers and costs, information regarding software, other information concerning the business and operations of the Company and other proprietary data or information, that is valuable, special and a unique asset of the Company. Consultant agrees not to disclose such confidential information, except as may be necessary in the performance of its duties, to any person, firm, corporation, association or entity, nor use such confidential information in any way, either during the term of this Agreement or at any time thereafter, until it has received the written consent of the Company or until such confidential information becomes public knowledge through no wrongful act of Consultant…

109.     Under their plain and ordinary language, these confidentiality provisions survive beyond the expiration or termination of each Agreement.

110.     To date, the information protected by these Agreements has not become public knowledge through anything other than the wrongful acts of Zhu as discussed otherwise herein.

111.     To date, ADS has performed all conditions precedent to Zhu's obligations to perform these Agreements.

112.     In the past five years Zhu has specifically used the confidential information protected by these Agreements including but not limited to: formulae, software information and source code, process designs, supplier and cost information, and other proprietary information he obtained from ADS to design and manufacture harvesters, auto spreaders, and consumable products associated therewith.

113.     In the past five years Zhu has specifically used ADS customer lists and pricing information to market and sell competing metaphase harvesters, auto spreaders, and consumable products to ADS's customers.

6512292.3

114.     The aforementioned activities are a misappropriation ADS's confidential information that is protected by these Agreements and, correspondingly, constitutes multiple breaches of these Agreements.

115.     Zhu also breached each of these Agreements by creating and/or engaging SPECTRON, MEINAITE, IDEX PI, IDEX-O Neckelmann, M. Orodpour, K. Orodpour for the sole purpose of misappropriating the confidential information he obtained from ADS as a result of his execution of these Agreements to develop, manufacture, and sell metaphase harvesters, auto spreaders, and consumable products associated therewith.

116.     Each of the aforementioned breaches have, either individually and/or jointly, proximately caused ADS damages, including but not limited to lost sales, profits, loss of goodwill, and other economic damages.

117.     As a result, ADS prays for an award of all damages caused by said breaches and in an amount to be proven at trial.

## COUNT VII: CONSPIRACY
### (SPECTRON, IDEX PI, IDEX-O, MEINAITE, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour)

118.     ADS incorporates by reference each and every allegation in the preceding paragraphs.

119.     At all material times, Zhu, Neckelmann, M. Orodpour, and/or K. Orodpour, individually and/or or through the entities they've created and/or engaged (including SPECTRON, IDEX PI, IDEX-O, and MEINAINTE) have sought to misappropriate ADS's trade secrets and goodwill built by ADS over the course of their existences.

6512292.3

120.    In furtherance of this goal, Defendants have entered into various agreements to conspire and misappropriate ADS's intellectual property, trade secrets, and confidential information, as well as breach agreements specifically implemented to protect the secrecy of ADS's trade secrets and confidential information.

121.    In furtherance of this goal, Defendants have (among other things) created trademarks that mimic those used by ADS, created a product that mimic's ADS's products, and communicated with ADS's customers in an attempt to divert sales from ADS to themselves.

122.    This conspiracy constituted a willful and wanton disregard of ADS's rights.

123.    As a result of this conspiracy, ADS has been and will continue to incur damages including lost profits, revenues, and other damages.

124.    Correspondingly, ADS prays for an award of all damages caused by said breaches and in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** ADS prays for the following relief:

1.    An injunction prohibiting ADS from engaging from further misappropriating or infringing upon the Trademarks, Trade Dress, and trade secrets identified herein, as well as cease all deceptive trade practices they are engaged in.

2.    Damages in the form of lost profits, revenues, royalties, liquidated, or statutory damages available under any of the statutes or common law identified herein and that are anticipated to exceed $75,000.

3.    Attorney's fees.

4.    Costs of this suit.

5.    Pre-and post-judgment interest to the extent allowed by law.

6512292.3

6.      Any other form of damages recoverable and identified herein.

7.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

ADS hereby demands trial by jury in Omaha, Nebraska as to all claims asserted in this Complaint.

Dated this 10th day of October, 2024.

ADSTEC CORPORATION and ADS BIOTEC, INC., individually and as successor in interest of TRANSGENOMIC, INC., Plaintiffs.

By   */s/ Kristina Kamler*
       Kristina Kamler, 24082
       Kira K. Strandquest, 28061
of   BAIRD HOLM LLP
       1700 Farnam Street, Suite 1500
       Omaha, NE 68102-2068
       Phone: 402-344-0500
       KKamler@bairdholm.com
       KStrandquest@bairdholm.com